1
2
3
4
5
6
7
8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHRISTOPHER HARBRIDGE,           )   Case No. 1:10-cv-00473 AWI JLT (PC)
                                       )
12              Plaintiff,             )   ORDER DENYING MOTION PURSUANT TO
                                       )   60(B)(1)
13        vs.                          )
                                       )   (Doc. 6)
14   JESSE PASILLAS, et al.,           )
                                       )   ORDER  DISMISSING  FIRST  AMENDED
15              Defendants.            )   COMPLAINT WITH LEAVE TO AMEND
     _____ )
16                                         (Doc. 9)

17

18        Plaintiff is a state prisoner proceeding pro se and *in forma pauperis* with a civil rights action

19   pursuant to 42 U.S.C. § 1983.  This proceeding was referred to the Magistrate Judge in accordance with

20   28 U.S.C. § 636(b)(1) and Local Rule 302.  Pending before the Court is Plaintiff's motion filed

21   according to Federal Rules of Evidence 60(B)(1) and his amended complaint filed May 3, 2010.[1]

22   **I.    Rule 60(B) motion**

23        A.    Background

24        Plaintiff asserts that he mailed his motion to proceed in forma pauperis on February 18, 2010.

25   (Doc. 6; Harbridge Dec)  However, he mailed it to an "O" Street where the Court was located prior to

26   _____

27        [1]  Plaintiff filed his original complaint and initiated this action on March 16, 2010.  Before the Court had the
     opportunity to screen the complaint in accordance with 28 U.S.C. § 1915(A), Plaintiff filed an amended complaint on May
28   3, 2010.  Because Plaintiff may amend his pleadings as a matter of right before service of a responsive pleading, see Fed. R.
     Civ. P. 15(a), the Court will disregard the original complaint and will evaluate the amended complaint for screening purposes.

1

1   its move in 2006.  Id.  Plaintiff asserts that he obtained this incorrect address from "the 2006 supplement

2   to the CALIFORNIA STATE PRISONER'S HANDBOOK, Third Edition, published by the Prison Law

3   Office."  Id.  Plaintiff states that this book was given to him by an inmate-employee who worked in the

4   prison law library.  Id.

5        Plaintiff reports that on March 7, 2010, he mailed his complaint for damages to the same "O"

6   Street address.  (Doc. 6; Harbridge Dec.)  On March 10, 2010, the motion to proceed IFP was returned

7   as "undeliverable."  Id.  Plaintiff reports that then he borrowed a fellow inmate's 2008 version of the

8   handbook and discovered the Court's correct address.  Id.  He re-mailed the IFP motion to the correct

9   address on March 11, 2010.  Id.  Likewise, when his complaint for damages was returned on March 12,

10  2010, he re-mailed it to the correct address on March 14, 2010.  Id.  In this motion, Plaintiff seeks a

11  determination that his action was initiated on February 18, 2010, the date that he mailed his IFP motion.

12  In essence, Plaintiff seeks an order preempting any defendants' ability to file a motion to dismiss under

13  Federal Rules of Civil Procedure 12(b) on statute of limitations grounds.

14        B.        Analysis

15        Under the prison mailbox rule, the date that the pro se prisoner deposits his document with prison

16  officials for mailing, is considered the filing date for purposes of evaluating whether it complied with

17  the statute of limitations.  Douglas v. Noelle, 567 F.3d 1103, 1109 (9th Cir. 2009).  The mailbox rule

18  requires that the prisoner deposit the pre-addressed, postage paid package to prison officials in order to

19  invoke the mailbox rule.  See In re Flanagan, 999 F.2d 753, 759 (3d Cir. Pa. 1993)  Moreover, the

20  prisoner bears the burden of proving the elements of the mailbox rule (Fed. R. Civ. P. 4(c)) though

21  "'when a pro se petitioner alleges that he timely complied with a procedural deadline by submitting a

22  document to prison authorities, the district court must either accept that allegation as correct or make

23  a factual finding to the contrary upon a sufficient evidentiary showing by the opposing party.'" Caldwell

24  v. Amend, 30 F.3d 1199, 1202 (9th Cir. 1994) (internal citation omitted).

25        Notably, here the motion is filed *before* any party has been served and, in fact, before the Court

26  has screened the case or authorized service.  Moreover, the declaration submitted by Plaintiff appears

27  to be insufficient on its face.  For example, Plaintiff does not allege that he deposited the documents with

28  prison officials or that he deposited it in the prison mailbox designated for legal mail.  Douglas, 567 F.3d

2

1  at 1108-1109. Instead, he says only that he "mailed to the U.S. District Court, Eastern Division, Fresno

2  Office a Request to Proceed In Forma Pauperis" and that "I mailed the above corresponding § 1983 Civil

3  Rights Complaint to the same address above."  (Doc. 5, Harbridge Dec.)  In any event, because no

4  defendant has appeared, the Court does not have the benefit of any opposing evidence.

5      Moreover, Plaintiff's motion purports to be filed pursuant to Federal Rules of Civil Procedure

6  rule 60(B)(1).  This rule provides, "On motion and just terms, the court may relieve a party or its legal

7  representative from a <u>final judgment, order, or proceeding</u> for the following reasons: (1) mistake,

8  inadvertence, surprise, or excusable neglect; . . ." Here, no final judgment or order has been entered

9  against Plaintiff.  Therefore, Plaintiff's motion raised under Federal Rules of Civil Procedure 60(B) is

10  procedurally improper and it is **DENIED.**

11  **I.      SCREENING**

12      **A.      Screening Requirement**

13      The Court is required to review matters filed by prisoners against government defendants.  28

14  U.S.C. § 1915(A)(a).  The Court is required to screen complaint also where the plaintiff seeks to proceed

15  in forma pauperis.  28 U.S.C. § 1915(e).   The Court must dismiss the action or portion thereof, if it is

16  frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief

17  against a defendant who is immune from such relief.  28 U.S.C. § 1915 (e)(2).  If the Court determines

18  the complaint fails to state a claim, leave to amend may be granted to the extent that the deficiencies of

19  the complaint can be cured by amendment.  <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127-28 (9th Cir. 2000) (en

20  banc).

21      **B.      Section 1983**

22      The Civil Rights Act under which this action was filed provides as follows:

23          Every person who, under color of [state law] . . . subjects, or causes to be
           subjected, any citizen of the United States . . . to the deprivation of any rights,
24          privileges, or immunities secured by the Constitution . . . shall be liable to the
           party injured in an action at law, suit in equity, or other proper proceeding for
25          redress.

26  42 U.S.C. § 1983.

27      To plead a § 1983 violation, the plaintiff must allege facts from which it may be inferred that (1)

28  plaintiff was deprived of a federal right, and (2) the person who deprived plaintiff of that right acted

1  under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Collins v. Womancare, 878 F.2d 1145,

2  1147 (9th Cir. 1989).  To warrant relief under § 1983, the plaintiff must allege and show that the

3  defendants' acts or omissions caused the deprivation of the plaintiff's constitutionally protected rights.

4  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1993).  "A person deprives another of a constitutional right,

5  within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative

6  acts, or omits to perform an act which he is legally required to do that causes the deprivation of which

7  [the plaintiff complains]."  Id.  There must be an actual causal connection or link between the actions

8  of each defendant and the deprivation alleged to have been suffered by the plaintiff.  See Monell v. Dept.

9  of Social Services, 436 U.S. 658, 691-92 (1978) (citing Rizzo v. Goode, 423 U.S. 362, 370-71(1976)).

10      **C.      Rule 8(a)**

11          Section 1983 complaints are governed by the notice pleading standard in Federal Rule of Civil

12  Procedure 8(a), which provides in relevant part that:

13          A pleading that states a claim for relief must contain:

14          (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court
            already has jurisdiction and the claim needs no new jurisdictional support;

15

16          (2) a short and plain statement of the claim showing that the pleader is entitled to relief;
            and

17          (3) a demand for the relief sought, which may include relief in the alternative or different
            types of relief.

18

19          The Federal Rules of Civil Procedure adopt a flexible pleading policy.  Nevertheless, a complaint

20  must give fair notice and state the elements of the plaintiff's claim plainly and succinctly.  See Bell

21  Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In other words, the plaintiff is required to give

22  the defendants fair notice of what constitutes the plaintiff's claim and the grounds upon which it rests.

23  Jones v. Community Redevelopment Agency, 733 F.2d 646, 649 (9th Cir. 1984).  Although a complaint

24  need not outline all the elements of a claim, there "must contain sufficient factual matter, accepted as

25  true, to 'state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 173 L.

26  Ed. 2d 868 (2009) (quoting Twombly, 550 U.S. at 570).  Vague and conclusory allegations are

27  insufficient to state a claim under § 1983.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir.

28  1982).

4

## II.    THE COMPLAINT

Plaintiff raises a number of claims that stem from his placement in Administrative Segregation[2] at Pleasant Valley State Prison.  Plaintiff was placed in Ad Seg on February 28, 2006, after he attended a hearing of the Institutional Classification Committee ("ICC"), made up of some of the defendants, who considered Plaintiff's single-cell status.  (Doc. 9 at 10)  At the hearing, the committee considered Plaintiff's extensive history of stated unwillingness to accept a cell mate. (Doc. 9, Ex. A)  The committee considered also the report of a psychologist who determined that Plaintiff's  "potential for violence, should he be housed with another inmate . . . is no greater than any other inmate housed on Facility D-SNY."[3]  Id.  In fact, Plaintiff had no history of violence or sexual abuse against a cell mate nor had he been the victim of such by a cell mate.  Id.

When the committee cleared Plaintiff for double-cell housing, Plaintiff became "extremely agitated" and stated that "he would do whatever he needed to retain his Single-Cell status" and referred to his past threats to kill or inflict bodily injury on any inmate that the CDCR attempted to place with him.  (Doc. 9, Ex. A)  Plaintiff cautioned that the CDCR should place with him a cell mate who had committed "a terrible crime against a woman or a child" because "I am a man with a conscious and I want to make sure they deserve what I am going to do to them."  Id.  As a result of these statements, the hearing was terminated and the committee determined that Plaintiff would be placed in the "ASU to protect the safety of staff, other inmates, and the institution."

The committee decided to issue Plaintiff a "CDC 115 for the specific act of 'Threatening Another Inmate.'" (Doc. 9, Ex. A)  On March 1, 2006, Plaintiff was served with the "Administrative Segregation Unit Placement Notice" which reads,

> On Tuesday, February 28, 2006, during General Population I.C.C. you threatened to kill any cellmate, in effect, refusing to be housed with any other inmate.  There are no precluding factors to prevent double cell housing. Therefore, you are being rehoused in Administrative Segregation due to your threats toward other inmates.  Because of these concerns, your continued presence within the general population presents a threat to the safety and security of the prison.  You will remain in Administrative Segregation pending administrative review  and further investigation.  As a result of this placement, your

---

[2] However, because the claims are raised against the same defendants, the complaint does not offend  Fed.R.Civ.P. 18(a).

[3] The Court is aware that "SNY" refers to the "Special Needs Yard" which houses inmates who require protective custody.

custody status/level, credit earnings, privilege group and visiting rights are subject to change . . .

(Doc. 9, Ex. D) This constituted a "Division D [level] offense"[4] and was classified as a "serious" offense. Id.   Plaintiff was found guilty of the offense and was assessed a credit forfeiture of 90 days. Id.

On March 9, 2006, Plaintiff attended another ICC hearing in the Ad Seg Unit.  (Doc. 9 at 6)  The committee was made up of defendants Williams, Brown and Reeves.  Id.  The purpose of the hearing was to determine whether Plaintiff would be retained in Ad Seg.  Id.  Plaintiff reported again that he refused to accept a cell mate.  Id.  Plaintiff alleges that in response, defendant Trimble told Plaintiff that "We have ways of changing your mind" and defendant Reeves explained that "We will strip you down naked and throw you in an empty cell.  You won't even have a mattress or a strip of paper to cover the vent with.  You'll be begging us to give you a cellie when you're frozen to the bone."  Id.  When Plaintiff continued to refuse to accept a cell mate, Reeves recommended that he be placed on "management status" and Trimble indicated that he agreed.  Id.

Defendants Munoz and Singleton placed Plaintiff in his cell, clad only in a t-shirt, boxers and a pair of socks.  (Doc. 9 at 7)  He was provided a blanket, a bar of soap and a roll of toilet paper.  Id. Plaintiff alleges that the outside, nighttime temperatures had been below freezing at the time and that there had been only unheated air blown into the Ad Seg unit for the ten days that he had been there.  Id. Plaintiff alleges that the cell was quite cold and that he was left in the cell for 24 hours until he agreed to accept a cell mate. Id. at 7-8.  Plaintiff asserts that he "had previously maintained his single-cell-status for several years through non-violent means.  But due to the torture, plaintiff simply waited until he was released from adseg and assaulted two different cellmates on the first day back in General Population in order to regain his single-cell-status." Id. at 8.

Plaintiff alleges that he was released from Ad Seg on May 2, 2006.  (Doc. 9 at 12)  On that day, Plaintiff engaged in two fights, as promised, with two proposed cell mates.  (Doc. 9 at 32-33)  As a result of this misconduct, Plaintiff was returned to Ad Seg where he remained until September 17, 2006.  (Doc.

---

[4]A Division D offense includes "Willfully resisting, delaying, or obstructing any peace officer in the performance of duty" which carries with it the potential punishment of forfeiture of up to 90 days credit.  Title 15 CCR § 3323 (f)(7)

1   9 at 26-27)

2       During the first fight on May 2, 2006, Plaintiff was ordered to the ground and he complied.

3   (Doc. 9 at 32-33) When he was being handcuffed, Plaintiff alleges that Defendant Redding leaned on

4   his back which caused Plaintiff pain for several days.  Id.  Then Redding tightened the handcuffs on

5   Plaintiff too tightly.  Id.  This caused Plaintiff pain in his wrists for several days.  Id.  When he was

6   walked out of the room, the officers pulled Plaintiff's handcuffed hands up, causing Plaintiff to walk the

7   200 yards to the program office while bent over.  Id.  This caused Plaintiff pain.  Id.  When he engaged

8   in the fight, he was barefoot.  Id.  Thus, as he walked to the program office, he had to walk barefoot over

9   grass and gravel.  Id.

10       During the second fight, the documents attached to the complaint indicate that Defendant

11   Redding saw Plaintiff walk toward another inmate, Gentry (Plaintiff's new cell mate) (Doc. 9 at 36), and

12   begin striking him in the upper torso and face with his fist. (Doc. 9 Ex F)  Redding gave Plaintiff

13   numerous orders to stop fighting and to "get down" on the ground.  Id.  Plaintiff ignored the orders and

14   continued striking Gentry in the face until Gentry fell to the ground and then Plaintiff began kicking

15   Gentry.  Id.  Redding used his expandable baton and struck Plaintiff in the upper left thigh and continued

16   to give Plaintiff commands to "get down" on the ground.  Id.  Plaintiff continued to ignore the

17   commands and stood over Gentry, taunting him.  Id.  Redding struck Plaintiff again on his lower left leg.

18   Id.  This time Gentry fell to the ground and the fight ended.  Id.

19       However, Plaintiff alleges, instead, that the use of force occurred after the Plaintiff had  fully

20   complied with Redding's orders.  (Doc. 9 at 36-37)  Plaintiff alleges that Redding was already angry

21   with him based upon an incident that happened a few hours before the fights.  During this earlier

22   incident, Defendant Redding threatened to use force against Plaintiff if he continued to refuse to accept

23   a cell mate.  (Doc. 9 at 35) During this contact, Redding told Plaintiff that he was being housed with a

24   cell mate and assigned Plaintiff to the top bunk.  (Doc. 9 at 37)  When Redding learned from the cell

25   mate that Plaintiff was attempting to force the cell mate to take the top bunk, Plaintiff alleges that

26   Redding took him to the sally port and assaulted him by pushing his head into the wall while holding

27   Plaintiff's  right arm behind him.  Id.

28       As a result of the fight with Gentry, Plaintiff was charged with a "serious," D-level offense and

7

was found guilty of mutual combat.  (Doc. 9, Ex F)  Plaintiff contends that after the fight, he complained

to Defendant McBride that he believed that his ankle was broken.  (Doc. 9 at 40)  Nevertheless McBride

ignored this complaint and forced Plaintiff to walk on the ankle as described above.  Id.  Plaintiff

complains that he was given no medical attention for two days, though the medical report he attaches

to his complaint demonstrates that he was given medical attention within five minutes of the fight.  (Doc.

9, at 45-46; Ex I)  When asked about the circumstances of the injury, Plaintiff responded "No comment."

(Doc. 9, Ex I)  The nurse who saw Plaintiff observed that he was "ambulatory."  Id.  Plaintiff claims that,

though he had a laceration on his thigh, the wound was not cleaned or bandaged.  (Doc. 9 at 47)

On May 5, 2006, Plaintiff's ankle was seen by Dr. Benyamin and then by specialist, Dr. Ferro.

(Doc. 9, Ex J)  Dr. Ferro determined that Plaintiff had a "small distal fibular fracture" of his ankle and

he provided "direct supervision" while Dr. Benyamin placed the ankle in a fiberglass cast.  (Doc. 9, Ex

F)  At the time, Plaintiff had only "mild to moderate tenderness."  (Doc. 9, Ex. J)  Dr. Ferro noted that

Plaintiff "states that he has been walking on this since [being hit by the baton] and that he does have

some associated pain and swelling" but "no pain over his hind foot, mid foot or fore foot areas including

his metatarsals."  Id.  Dr. Ferro observed that Plaintiff "does have some distal lateral swelling and

ecchymossis."  Id.  Dr. Ferro told Plaintiff that the cast would be removed in five to six weeks but "If he

has any questions or concerns in the interim he knows that he can always get ahold of me on A-yard and

I will be happy to see him there."  Id.

On May 7, 2006 and May 8, 2006, Plaintiff complained to Defendant Dishman that his toes were

turning purple.  (Doc. 9 at 50)  On May 9 he was examined by Dr. Benyamin who determined that the

cast was too tight.  Id.  Later that day, Plaintiff was taken to an outside medical facility where the doctor

there felt that the ankle should have been placed in a splint until the swelling subsided.  Id.  The doctor

placed him in a plaster cast that was designed to expand with the swelling.  Id.

Plaintiff complains also that the cast was removed 11 to 18 days later than Dr. Ferro's initial

estimate that he would wear the cast for five to six weeks.  (Doc. 9 at 54-56)  Plaintiff claims that this

delay in removing the cast made the recovery more difficult.  Id.  He alleges that he was not given

physical therapy, orthopedic shoes or effective, assistive walking devices afterward.  (Doc. 9 at 56-58)

He claims that this prolonged his recovery.  Id.

On March 3, 2006, Plaintiff was told by custodial staff that he would be placed on the exercise yard, along with all of the other inmates in "H" section of the Ad Seg unit, to allow maintenance work to occur on the cell doors. (Doc. 9 at 19-20) Plaintiff refused to be taken to the yard because he felt that it was too cold to be outside. Id. He would cooperate with being "cuffed up" for transport only when the officers agreed to place him in a holding cell with a bench rather than going onto the exercise yard. Id. However, the officers placed him in a small "telephone booth" sized holding cell, without a bench. Id. Plaintiff was left in the cell for three hours and, when he became tired, was forced to sit on the floor with his knees bent, due to the small size of the cell. Id.

Furthermore, Plaintiff complains that although outdoor exercise was made available to him on a regular basis, he refused to participate in it because he felt that the outdoor temperatures were too cold. (Doc. 9 at 25-26) He asserts that because he had inadequate clothing for the outdoor temperatures, in essence, he was deprived of outdoor exercise. Id.

Also, on March 5, 2006, Plaintiff submitted a form requesting a refill of his medication for his acid reflux condition. (Doc. 9, Ex. E) He reported on his "Health Care Service Request Form" that "my acid reflux is severe, hurry please. I cannot lay down without pain." Id. The request was evaluated as "routine" by Defendant Stephenson, a registered nurse, and he was referred to "MD line for addressing med issue." Id. He was seen by a medical professional on March 21, 2006 and the next day received his medication. Id. Plaintiff alleges that this caused him to suffer severe pain "repeatedly throughout the day," whenever he lay down and that the pain would interrupt his sleep. (Doc. 9 at 18) He complains also that when he became ill, the medical staff diagnosed his symptoms as a common cold although he contended that it was caused by unsanitary conditions. (Doc. 9 at 29)

Plaintiff alleges that throughout the time that he was in Ad Seg, he and the other inmates housed there, suffered cold air being blown through the ventilation system and that they were without adequate clothing to stay warm. (Doc. 9 at 21-22) Plaintiff complains that the Ad Seg building was made of concrete which was very cold and that this increased the effect of the cold blowing air. Id. Plaintiff complains also that inmates in Ad Seg were given no outer garments and were forced to wear only t-shirts, boxers and socks. Id. However, conversely, Plaintiff admits that he was provided thermal underwear and that he had them in his possession from March 3, 2006 through April 24, 2006. Id.

1  However, because the thermal wear was supposed to have been surrendered on April 2, 2006 (although

2  Plaintiff did not do so), Plaintiff could not wear the thermals all of the time for fear that they would be

3  confiscated as contraband.  Id.

4       Sometimes, when sharing a shower-cell, Plaintiff was forced to wait his turn to shower near the

5  front of the cell which was drafty or had to wait in the shower cell, while still damp from his shower,

6  which made him cold.  Id.  Plaintiff alleges that the shower cell was not cleaned everyday and that the

7  method of cleaning was insufficient.  (Doc. 9 at 27-28)  He complains that the water pressure in the

8  shower cells was low and he was given inadequate time to shave.  Id.  Plaintiff alleges that the nail

9  clippers that were available for use were often broken so he was forced to bite his nails to trim them.

10 Id.  Plaintiff contends that his cell was inadequately cleaned and furnished and when Plaintiff was given

11 a jumpsuit to wear to "an adseg committee hearing," it was not clean.

12      Plaintiff complains also that when he was transferred to Ad Seg, his belongings, except those

13 noted above, were confiscated, including his stamps.  (Doc. 9 at 31)  When he wrote a letter and

14 attempted to mail it in an "indigent" envelope obtained from a fellow-inmate, prison staff returned it to

15 him because he was not indigent and had money in his prison trust fund account to pay for postage.  Id.

16      Based upon these factual allegations, Plaintiff alleges 21 "claims" of violations of the Eighth

17 Amendment prohibition against cruel and unusual punishment.

18 **III.    DISCUSSION**

19      **A.    Statute of Limitations for § 1983 actions**

20      For actions brought pursuant to 42 U.S.C. § 1983, federal courts apply the forum state's statute

21 of limitations period for personal injury actions.  Wilson v. Garcia, 471 U.S. 261, 266-80 (1985); Jones

22 v. Blanas, 393 F.3d 918, 927 (9th Cir. 2004).  Prior to January 1, 2003, the statute of limitations period

23 in California for personal injury claims was one year.  Maldonado v. Harris, 370 F.3d 945, 954 (9th Cir.

24 2004).  Effective January 1, 2003, the statute of limitations period in California for personal injury

25 claims was extended to two years.  Cal. Civ. Proc. Code § 335.1.  The extension of the statute of

26 limitations period to two years applies to all claims that were not yet time-barred as of January 1, 2003

27 by the then-applicable statute of limitations period.  Andonagui v. May Dept. Stores Co., 128 Cal. App.

28 4th 590, 597-98 (2009).  However, the extension of the statute of limitations period cannot revive claims

1  that were already time-barred under the previous one-year statute of limitations period. Id.; Maldonado,

2  370 F.3d at 954.

3       Federal courts also apply the forum state's laws regarding tolling to the extent that state law is

4  not inconsistent with federal law. Jones, 393 F.3d at 927. Under California law, a prisoner is entitled

5  to statutory tolling for up to two years if the cause of action accrued during incarceration. Cal. Civ. Proc.

6  Code § 352.1. This section reads, "If a person entitled to bring an action, . . . is, at the time the cause

7  of action accrued, imprisoned on a criminal charge, or in execution under the sentence of a criminal

8  court for a term less than for life, the time of that disability is not a part of the time limited for the

9  commencement of the action, not to exceed two years." In Martinez v. Gomez, 137 F.3d 1124, 1126

10  (9ᵗʰ Cir. 1998), the Court relied upon Grasso v. McDonough Power Equipment, Inc., 264 Cal.App.2d

11  597, 599-601 (Cal. App. 1ˢᵗ Dist. 1968) and determined that the phrase "term less than for life," does not

12  preclude an inmate serving an indeterminate life sentence from receiving the benefit of the tolling

13  provision. Thus, because Plaintiff is serving an indeterminate life sentence, and he is raising claims that

14  accrued while he was incarcerated on that sentence, his statute of limitations was tolled for four years.

15       **B.     The case was commenced at the filing of the complaint.**

16       Though Plaintiff asserts that the action was commenced at the filing of his motion to proceed in

17  forma pauperis (Doc. 9 at 2), this is incorrect. Plaintiff cites Powell v. Jacor Communications Corporate,

18  320 F.3d 599, 602-603 (6th Dist. 2003), in support of his position.  (Doc. 6 at 2)  However, in Powell,

19  the plaintiff filed her complaint *at the same time* as her IFP motion which was two days *before* the

20  expiration of the statute of limitations.  Powell, at 602-603.  The issue presented to the court was

21  whether the complaint would be deemed to be timely despite that it was not "filed" while the IFP motion

22  was pending. Id. The court held that because the complaint was received by the Court before the statute

23  of limitations expired, the delay in "filing" the complaint caused by the pendency of the IFP motion, did

24  not make the action untimely. Id. The court had no occasion to determine whether filing an IFP motion

25  *without* filing an accompanying complaint would have been sufficient to toll the statute of limitations.[5]

26  _____

27       [5]It would be illogical to determine that an IFP motion, without filing a complaint, tolled the statute of limitations.

28  An IFP motion is made *in lieu of* paying a filing fee.  A filing fee is not due *until a complaint is filed*.  Moreover, an IFP motion may be denied if the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted or seeks a damage award against a defendant who is immune from that type of relief. 28 U.S.C. 1915(e); Franklin v. Murphy,

1  Likewise, in <u>Move Organization v. Philadelphia</u>, 530 F.Supp. 764, 766 (E.D. PA 1982), the court

2  determined that the complaint was timely given that it was filed along with the motion to proceed IFP

3  before the expiration of the statute of limitations.

4        Under Federal Rules of Civil Procedure Rule 3, "A civil action is commenced by filing a

5  complaint with the court." Thus, according to Federal Rules of Civil Procedure Rule 3, it is the *timely*

6  *filing of the complaint* that tolls the statute of limitations, not the filing of an IFP motion. For example,

7  in <u>Baldwin County Welcome Ctr. v. Brown</u>, 466 U.S. 147, 148 (U.S. 1984), the plaintiff filed her "right-

8  to-sue" letter within the statute of limitations period. Along with the letter, she submitted a request for

9  appointment of counsel. <u>Id.</u> In rejecting that this was sufficient, the Court found that the right-to-sue

10  letter did not suffice as a complaint because it failed to set forth a short, plain statement of the case as

11  required by Federal Rules of Civil Procedure Rule 8. <u>Id.</u> at 149. The Court reiterated that strict

12  compliance with Rule 3 is required to "commence" litigation and toll the statute of limitations. The

13  Court observed,

14       Procedural requirements established by Congress for gaining access to the federal courts
    are not to be disregarded by courts out of a vague sympathy for particular litigants. As

15       we stated in <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980), "in the long run,
    experience teaches that strict adherence to the procedural requirements specified by the

16       legislature is the best guarantee of evenhanded administration of the law."

17  <u>Id.</u> at 152.

18        Therefore, the Court finds that Plaintiff's act of filing his motion to proceed IFP did not toll the

19  statute of limitations. Moreover, assuming without deciding that the mailbox rule applies (despite

20  Plaintiff's failure to use the Court's correct address), the Court finds that all claims occurring before

21  March 8, 2006, are barred by the statute of limitations. Therefore, Claims 2 through 7, Claim 11 and

22  Claims 8 through 10 (only as to the acts in Claims 8 through 10 that are alleged to have occurred before

23  March 8, 2006) are **DISMISSED**.

24       **C.**    **Eighth Amendment claims - Conditions of Confinement**

25       The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners

26  from inhumane conditions of confinement. <u>Morgan v. Morgensen</u>, 465 F.3d 1041, 1045 (9th Cir. 2006)

27

28  745 F.2d 1221, 1226-1227 (9th Cir. 1984). Thus, an IFP motion cannot be evaluated in the absence of a complaint for
    damages.

1   (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  To plead a viable conditions of confinement

2   claim, a plaintiff must allege facts satisfying both an objective and subjective component.  See Wilson

3   v. Seiter, 501 U.S. 294, 298 (1991).  First, a plaintiff must demonstrate an objectively serious

4   deprivation, one that amounts to a denial of "the minimal civilized measures of life's necessities."

5   Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996) (quoting Rhodes v. Chapman, 452 U.S. 337, 346

6   (1981)).  The Eighth Amendment's prohibition on cruel and unusual punishment "'does not mandate

7   comfortable prisons,' and conditions imposed may be 'restrictive and even harsh.'"  Barney v. Pulsipher,

8   143 F.3d 1299, 1311 (10th Cir. 1998) (quoting Rhodes v. Chapman, 452 U.S. at 347.  Instead the facts

9   must demonstrate "conditions posing a substantial risk of serious  harm." Farmer, 511 U.S. at 834.

10  Minor deprivations suffered for short periods of time will not rise to the level of an Eighth Amendment

11  violation but "substantial deprivations of shelter, food, drinking water, and sanitation" may meet the

12  standard despite their even shorter duration. Johnson v. Lewis, 217 F.3d 726, 732 (9th Cir. 2000); see

13  also Whitnack v. Douglas County, 16 F.3d 954, 958 (8th Cir. 1994) ("the length of time required before

14  a constitutional violation is made out decreases as the level of filthiness increases.").

15          Second, a plaintiff must show that prison officials acted with a sufficiently culpable state of

16  mind, that of "deliberate indifference."  Wilson, 501 U.S. at 303; Johnson, 217 F.3d at 733.  In other

17  words, a prison official is liable for inhumane conditions of confinement only if "the official knows of

18  and disregards an excessive risk to inmate health and safety; the official must both be aware of facts

19  from which the inference could be drawn that a substantial risk of serious harm exists, and he must also

20  draw the inference."  Farmer, 511 U.S. at 837.

21                  i.      Claim 1- Management Status

22          Plaintiff alleges that he was placed on "management status" on March 9, 2006, due to his

23  ongoing refusal to accept a cell mate and his repeated threats to kill any cell mate placed with him.

24  (Doc. 9 at 6-7)  As noted above, Plaintiff was "cleared" to "double cell" on February 28, 2006.  (Doc.

25  9, Ex. A) Until this date, Plaintiff had been able to avoid having a cell mate by making threats to kill

26  those placed with him. Id.; Doc. 9 at 32-33.

27          The May 25, 2003 "Double-Cell Housing Policy" maintained by the CDCR reads,

28          It is departmental policy and therefore the expectation that inmates double-cell and

13

1
2
3

accept housing assignments as directed by staff . . . If staff determine that an inmate is, suitable for double-celled housing, the inmate shall be expected to accept the housing assignment and shall be held accountable and responsible for his or her actions and subject to, disciplinary action as a result of staff enforcing the double-cell housing assignment.

4   (Doc. 9, Ex B)  Moreover, the Policy instructs,

5
6
7

If the inmate conveys to staff a threat against any prospective cellmate and the threat prevents staff from double-ceiling the inmate, the inmate shall be issued a CDC Form 115 charging him or her with the specific act of "'Willfully Delaying/Obstructing a Peace Officer in Performance of Their Duties by Means of a Threat," a Division D level offense (Penal Code [PC] Section 69).

8   Id. Title 15 of the California Code of Regulations section 3005(c) instructs that "Inmates shall not refuse

9   to accept a housing assignment such as but not limited to, an integrated housing assignment or a double

10  cell assignment, when case factors do not preclude such."  Likewise, Title 15 of the California Code of

11  Regulations section 3269 reads,

12
13
14

Inmates shall accept Inmate Housing Assignments (IHAs) as directed by staff. It is the expectation that all inmates double cell . . . If staff determines an inmate is suitable for double celling, . . . the inmate shall accept the housing assignment or be subject to disciplinary action for refusing. . .Inmates are not entitled to single cell assignment . . .

15  Title 15 of the California Code of Regulations section 3332(f) defines provides,

16
17
18

An inmate who persists in unduly disruptive, destructive or dangerous behavior and who will not heed or respond to orders and warnings to desist from such activity, may be placed in a management cell on an order of the unit's administrator or, in his or her absence, an order of the watch commander.

19      This Court has determined that placing an inmate in management status does not offend the

20  Eighth Amendment.  In Loeb v. Felker, 2007 U.S. Dist. LEXIS 14280 at *14-15 (E.D. CA 2007), the

21  Court held,

22
23
24
25
26
27

California's regulations permit prison officials to place a prisoner on management cell status if he persists in disruptive, destructive or dangerous behavior (i.e. cell extraction, refusal to exit the yard, etc.). While on management status, a prisoner receives one t-shirt, one pair of socks, one pair of boxer shorts, and one blanket. He also may be denied yard access.  **While plaintiff argues that these conditions are harsh, they are not sufficiently serious to be violative of the Eighth Amendment**. Johnson v. Lewis, 217 F.3d at 732. Plaintiff was on management cell status for relatively short periods of time to address his refusals to follow orders, and the limited duration of those time periods counsels against finding an Eighth Amendment violation. Id. The measures taken to respond to each of plaintiff's episodes of disruptive behavior were reasonable. On the evidence presented here, no reasonable jury could find in plaintiff's favor on this claim.

28  Notably, before being placed on management status, Plaintiff was given a hearing. (Doc. 9 at 6) He was

confronted with his past refusal to accept a cell mate and his threats to kill inmate any placed with him. Id. Rather than acquiescing to the double cell assignment, Plaintiff continued to threaten to kill any cell mate placed with him. Id. Management status is designed to discipline inmates who refuse to comply with orders to cease disruptive conduct. Thus, the fact that Plaintiff was placed on management status, with the concomitant reduction in privileges and the removal of excess possessions, does not state a claim under the Eighth Amendment.

However, Plaintiff complains that while on management status for approximately 24 hours, his cell was quite cold. (Doc. 9 at 6) Plaintiff complains that for the ten days prior, the ventilation system had been blowing unheated air and that the outside temperatures were below freezing at night. Id. at 7. He alleges that the walls and floor of his cell felt "like ice to the touch." Id. Given his management status, had only a t-shirt, a pair of boxers, a pair of socks and one blanket. Id. The piece of cardboard that he used to cover his ventilation outlet in the days before his transfer to management status was removed as well. Id. Plaintiff alleges that Defendants Trimble, Williams, Brown and Reeves were aware of the temperature in the cell and decided to place him there without adequate clothing was deliberate for the purpose of causing harm. Id. at 6.

In Johnson v. Lewis, 217 F.3d at 731-732, the Court held that there was a question of fact whether requiring inmates to remain in subfreezing temperatures without sufficient clothing or blankets for five to nine hours may be sufficient to state an Eighth Amendment claim. Thus, though it seems unlikely that Plaintiff was subject to subfreezing temperatures while he was held in management status, he has pleaded sufficiently to state a claim for a violation of the Eighth Amendment against Defendants Trimble, Williams, Brown and Reeves related to the temperature of the cell only.

Plaintiff names Defendants Munoz and Singleton who were charged with the duty of removing Plaintiff's excess property from him. (Doc. 9 at 7) There are no facts alleged that these defendants knew of the temperature of the cell or that they removed the property for the purpose of causing constitutional harm. Instead, the complaints implies that property was removed merely because Plaintiff's management status required it. Loeb v. Felker, 2007 U.S. Dist. LEXIS 14280 at *14-15. Thus, as to Defendants Munoz and Singleton, Claim 1 is **DISMISSED**.

///

15

1

*A.      Supervisory liability under 42 USC § 1983*

2      Plaintiff alleges that Warden Yates and Former Secretary of the CDCR Hickman are liable for

3  the temperature of the cell.  However, there are no facts alleged that either person played any role in

4  determining the temperature of Plaintiff's cell.  Instead, Plaintiff seems to believe that they are liable

5  merely due to their high supervisory levels within the CDCR.  This is insufficient.

6      There is no respondeat superior liability under 42 U.S.C. § 1983.  <u>Palmer v. Sanderson</u>, 9 F.3d

7  1433, 1437-38 (9th Cir. 1993); <u>Monell</u>, 436 U.S. at 691 (the supervisor of someone who allegedly

8  violated a plaintiff's constitutional rights is not made liable for the violation by virtue of that role).

9  "Liability under § 1983 arises only upon a showing of personal participation by the defendant. (Citation.)

10  A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated

11  in or directed the violations, or knew of the violations and failed to act to prevent them. There is no

12  respondeat superior liability under § 1983." <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989), citation

13  omitted.   Recently, the Supreme Court rejected that a supervisor can be held liable for his mere

14  "knowledge and acquiescence" in unlawful conduct by his subordinates. <u>Ashcroft v. Iqbal</u>, 129 S. Ct.

15  at 1949.  The Court held,

16

17

18

19

20

> . . . respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. **In a § 1983 suit or a** *Bivens* **action--where masters do not answer for the torts of their servants--the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.**

21  <u>Id.</u>, emphasis added.  Therefore, Plaintiff has not stated a claim against Defendants Yates and Hickman

22  and the claim against them is **DISMISSED**.

23  <u>Conclusion</u>

24       As to Claim 1, Plaintiff has stated an Eighth Amendment violation against Defendants Trimble,

25  Williams, Brown and Reeves related to the temperature of the cell only.  He has not stated a claim

26  against any other defendant and as to them, the claim is **DISMISSED.**

27             *ii.      Claim 8- Temperature in Ad Seg from March 8, 2006 through Sept. 17, 2006*

28       Plaintiff claims that while he was housed in Ad Seg, the temperature of his cell was cold.  (Doc.

16

9 at 21) He claims that the ventilation system blew only unheated air into the cell while the outside temperatures were cold and when spring and summer arrived, the air conditioner blew cold air into the cell.  Id.  He complains that the thermal underwear that he had been issued on March 3, 2006 were confiscated on April 24, 2006 (the bottoms) and on May 2, 2006 (the top).  Id. at 23 -24.  Likewise, he complains that while in Ad Seg, he was not permitted to keep excess clothing and belongings that he could have used to keep warm.  Id.  Plaintiff alleges also that remaining in his bed did not provide sufficient warmth because the concrete walls radiated the cool temperatures.  Id.

The fact that an inmate is required to "bundle up" while indoors does not state an Eighth Amendment claim.  Dixon v. Godinez, 114 F.3d 640 (7th Cir. Ill. 1997).  However, Plaintiff alleges that he was not provided sufficient clothing or blankets to allow him to adequately "bundle up."[6]  Thus, ordinarily, the facts would be sufficient to state an Eighth Amendment challenge.  Wilson v. Seiter, 501 U.S. 294, 304 (U.S. 1991).

Nevertheless, Plaintiff fails to allege any facts that any of the named defendants had any control over the temperature in his cell.  Instead, he merely concludes that they had control.[7]  Moreover, Plaintiff admits that the names these defendants merely because, "[t]hey were all ranking officers who were in charge of the adseg unit." (Doc. 9 at 24)  This is insufficient.  Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1993).  In addition, for the same reasons set forth in B.i.A. above, Plaintiff has failed to state a claim against Defendants Yates and Hickman.  Therefore, the claim must be **DISMISSED**.

Conclusion

As to Claim 8, Plaintiff has not stated an Eighth Amendment violation against any Defendant.  Thus, the claim is **DISMISSED.**

iii.    Claim 9- Denial of outdoor exercise from March 8, 2006 through May 1, 2006[8]

---

[6]On the other hand, if the temperatures were only sufficiently low to allow the correctional officers, while uniformed and moving about, to work in a comfortable temperature, it seems that Plaintiff's claims about the temperature in his cell may be overstated.  (Doc. 9 at 24) However, this is a question of fact that cannot be resolved at this juncture.

[7]Moreover, the lack of control over the cell temperature is demonstrated by the allegation that Defendant Brown used a space heater in his office.  (Doc. 9 at 24)

[8]Though Plaintiff alleges that the exercise deprivation continued through May 2, 2006, due to his placement in Ad Seg, in fact he was released from Ad Seg on May 2, 2006 but returned there later the same day after he attacked and beat two prospective cell mates.  (Doc. 9 at12, 32-33)

17

1        Plaintiff alleges that he was offered outdoor exercise three times per week but because he was

2   not provided outdoor clothing or permitted to bring blankets or sheets outside, in essence, he was denied

3   outdoor exercise. (Doc. 9 at 25) Plaintiff alleges that the outdoor temperatures "during the cold season

4   was very harsh."[9] Id.  Plaintiff alleges that the outside exercise period lasted between three and four

5   hours and that once outside, he was not permitted to return inside until the exercise period ended. Id.

6        Although exposure to inclement weather without  proper clothing can meet the objective prong

7   of an Eighth Amendment violation (Gordon v. Faber, 973 F.2d 686, 687-689 (8th Cir. 1992)), here,

8   Plaintiff was never forced to go outside.  Likewise, he was never deprived of exercise time; in fact, he

9   was offered exercise periods three times per week for three to four hours each. (Doc. 9 at 25)  He chose

10  not to engage in the exercise because he was dissatisfied with the weather conditions.[10]

11       However, Plaintiff's allegations raise an inference that the offer of exercise was illusory because

12  the temperatures, coupled with the lack of outdoor-wear, made participation in the exercise impossible.

13  Because the Ninth Circuit Court of Appeal has determined that deprivation of exercise for six-and-one-

14  half weeks is a violation of the Eighth Amendment (Lopez v. Smith, 203 F.3d 1122, 1132-1133),

15  Plaintiff has alleged sufficient facts under this claim.

16       However, Plaintiff fails to provide sufficient facts to link each or any of the named defendants

17  to the alleged harm.  Though he alleges that he told various defendants that he could not go out unless

18  he was provided with additional clothing, he has failed to provide any facts that any single defendant

19  knew how much exercise time he had missed.  Temporary deprivations of exercise time are insufficient

20  to state a constitutional violation. May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997).  Moreover, he

21  asserts that Brown and Williams are liable only because they are the supervisors of Reeves, Torrez and

22  Collier.  Also, he concludes, without any supporting facts, that Brown and Williams created the policies

23  that caused the deprivation but he fails to identify the policies or provide any facts demonstrating that,

24

25      [9]Plaintiff fails to provide any allegation as to the actual outdoor temperatures.  In the Court's experience, the winter
       temperatures in Coalinga, California, where PVSP is located, is rarely harsh and never "very harsh."  Thus, it appears that

26  Plaintiff may be overstating his claims.  However, once again, Plaintiff has created a factual question that cannot be resolved
       at this stage of the litigation.

27      [10]Though being forced to endure subfreezing temperatures for less than five hours, does not necessarily constitute

28  an Eighth Amendment claim (Johnson v. Lewis, 217 F.3d at 731-732), Plaintiff has alleged sufficient facts to state a claim
       under the Eighth Amendment.

in fact, either defendant or the policies caused the deprivation.  Finally, for the same reason as stated before, Plaintiff has failed to provide any facts linking defendant Yates to the alleged deprivation. Therefore Plaintiff has failed to state a claim and Claim 9 must be **DISMISSED**.

Conclusion

As to Claim 9, Plaintiff has not stated an Eighth Amendment violation against any Defendant. Thus, the claim is **DISMISSED.**

     *iv.    Claim 10- Cleanliness of Plaintiff's cell and the shower cells*

Plaintiff complains that while he was in Ad Seg, he was not provided cleaning supplies to use in his cell and complains that he was not provided a place to hang his towel.  (Doc. 9 at 27) Likewise, Plaintiff complains that there was only one desk in his cell, despite having to share it with another inmate.  Id.  He contends that only one inmate could use the desk while eating.  Id. at 28.  Even still, Plaintiff complains that the desk was used as a stepping platform onto the top bunk and, as such, it was unhygienic to place his food tray on the desk.  Id.  Rather than sit on the bunk and hold the tray on his lap or place the try on the bed surface while eating, Plaintiff alleges that he had to sit on the toilet with the food tray on his lap while eating.  Id

He complains also that his fingernails were broken on occasion and the clippers that he could use were often broken which required him to chew his broken nails to trim them.  (Doc. 9 at 27) Plaintiff complains also that the shower cells were not cleaned everyday and the method by which they were cleaned, through "hosedown," was insufficient.  Id.  Plaintiff asserts that the hot water knob was "perpetually smeared with soap" and that there was a "blood" stain on the shower for many days.[11]  Id. Likewise, Plaintiff complains also that the water pressure in the shower was low which made it difficult to wash properly and shave in the five minutes allowed.  Id.  Plaintiff asserts that the water was not as hot as in the general population and describes the temperature as "lukewarm at best."  Id.  Plaintiff complains also that the shower cells were inadequately furnished and he was forced to put his shower supplies on the floor while washing. Id. at 28.  Finally,  Plaintiff complains that when he attended an Ad

---

[11]Plaintiff provides only his conclusion that the stain was blood as opposed to some other material.

19

Seg committee hearing, he was provided a "dirty" jumpsuit.[12] Id. at 28.  Plaintiff asserts that wearing the dirty jumpsuit caused him to have cold-like symptoms and which were incorrectly diagnosed as a common cold.  Id.  Based upon these allegations, Plaintiff alleges that he was subject to cruel and unusual punishment as prohibited by the Eighth Amendment. Id. at 26.

In essence, Plaintiff alleges that Defendants were responsible for the inmates and, therefore, should be held liable for these conditions.  However, as noted above, to state a constitutional deprivation, he must allege facts, not mere conclusions, to demonstrate that each acted to cause the injury and that they did so with deliberate indifference to this harm.  The complaint fails to do this.  Mere acquiescence in a constitutional violation by a supervisor is insufficient.  Ashcroft v. Iqbal, 129 S. Ct. at 1949.

On the other hand, the allegations made simply do not state a constitutional claim. Subjecting a "prisoner to lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment." Anderson v. County of Kern, 45 F.3d 1310, 1315-1315 (9th Circ. 1995), citing Gee v. Estes, 829 F.2d 1005, 1006 (10th Cir. 1987) (an inmate placed in a lice-infested cell with no blankets in below forty-degree temperatures, with little or no edible food and left with his head in excrement while having a seizure stated a claim under the Eight Amendment); McCray v. Burrell, 516 F.2d 357, 366-69 (4th Cir. 1974) (prisoner placed naked in a bare, concrete cell with excrement-encrusted pit toilet for 48 hours without no bedding, sink, washing facilities, or personal hygiene stated a claim), cert. denied, 426 U.S. 471 (1976); LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972) (prisoner confined for five days in a strip cell with only a pit toilet and no light, sink, or washing facilities stated a claim).

Though Plaintiff alleges conditions that are unpleasant, none rise to the level of severe sanitation problems such to describe an unconstitutional condition. Famrer v. Brennan, 114 S.Ct. 1977. Courts have held that conditions far worse than those alleged by Plaintiff do not state an Eighth Amendment violation. See Geder v. Godinez, 875 F.Supp. 1334, 1341-1342 (N.D. Ill. 1995) (allegations of defective pipes, sinks and toilets, improperly cleaned showers, broken intercom system, stained mattresses,

---

[12]He concludes that the jumpsuit was used by other inmates during the day and was left in a n open floor in a bag between hearings so that it was accessible to crickets and mice.  Id. at 28.  However, he provides no facts to support these conclusions.

accumulated dust and dirt, and infestation by roaches and rats, viewed separately or cumulatively, were insufficient to establish deprivation of human need sufficient to constitute violation of the Eighth Amendment); Wilson v. Schomig, 863 F.Supp. 789, 794-795 (N.D. Ill. 1994) (absent showing of physical harm, claim that inmate was forced to sleep on urine- and feces-stained mattress in dirty, roach-infested cell did not rise to level of Eighth Amendment violation).  Therefore, Plaintiff's claims related to the cleanliness of his cell and the shower, the lack of furnishings in these areas and the failure to provide nail clippers do not state a claim.

Likewise, Plaintiff's claim that he has been forced to wear a dirty jumpsuit on occasion when attending an Ad Seg hearing was a temporary condition of limited duration that does not amount to a violation of the Eighth Amendment.  Likewise, the fact that Plaintiff disagrees that his cold-like symptoms were, in fact, caused by his contracting a common cold, does not state a claim.  Differences of opinion between a prisoner and prison medical staff as to proper medical care do not give rise to a § 1983 claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.1981).

Finally, as to the failure to provide hot water in the showers, the complaint is vague.  Plaintiff alleges that the water temperature was "not hot as in GP housing units" and "lukewarm at best," Plaintiff does not allege facts to support these conclusions.  Objective factual allegations, i.e. the temperature of the water in degrees Fahrenheit, is necessary because what may seem cool to one person may be warm to another.  Likewise, he does not allege how frequently the water was insufficiently warm, i.e., whether "the hot water had run out" by the time of his shower or whether there was never hot water.  Finally, he fails to provide any factual allegations that the defendants knew that the water was not sufficiently warm, that they were deliberately indifferent to this condition or that they had any causal connection to the condition.  Thus, this claim must be **DISMISSED**.

Conclusion

As to Claim 10, Plaintiff has not stated an Eighth Amendment violation against any Defendant.  Thus, the claim is **DISMISSED.**

*v.*     *Claims related to Excessive Force*

When a prison official uses excessive force against a prisoner, he violates the inmate's Eighth

Amendment right to be free from cruel and unusual punishment." <u>Clement v. Gomez</u>, 298 F.3d 898, 903 (9th Cir.2002). "Force does not amount to a constitutional violation in this respect if it is applied in a good faith effort to restore discipline and order and not 'maliciously and sadistically for the very purpose of causing harm.'" <u>Id</u>. quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986)). To make this determination, the Court may evaluate "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' . . . 'any efforts made to temper the severity of a forceful response'" and the extent of any injury inflicted. <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992). "'To state a claim for failure to intervene, Plaintiff must allege circumstances showing that these officers had an opportunity to intervene and prevent or curtail the violation (e.g., enough time to observe what was happening and intervene to stop it), but failed to do so.' <u>Gonzales v. Cate</u>, 2010 U.S. Dist. LEXIS 100446, 2010 WL 3749236, *3 (E.D. Cal., 2010) (citing <u>Robins v. Meecham</u>, 60 F.3d 1436, 1442 (9th Cir.1995)).'" <u>Lanier v. City of Fresno</u>, 2010 U.S. Dist. LEXIS 130459 (E.D. Cal. Dec. 8, 2010)

**A.**    *Claims 12, 13, 14, 15[13] - Excessive Force by Defendant Redding*

Plaintiff alleges Defendant Redding used excessive force on him during two fights Plaintiff had with two cell mates on May 2, 2006 and during a separate incident earlier on the same day. Also, Plaintiff alleges that Redding lifted his arms up in a painful posture despite there was no penological purpose for it and despite that he was cooperative and offering no resistance. (Doc. 9 at 40) Because it is unlawful for an officer to use force on a compliant inmate, these allegations state a cognizable violation of the Eighth Amendment.  <u>LaLonde v. County of Riverside</u>, 204 F.3d 947, 961 (9th Cir. 2000)(use of force on a person after surrender constitutes excessive force).

On the other hand, Plaintiff's claim, that making him walk on his injured ankle constitutes excessive force, is unsupported.  Although Plaintiff alleges that he told McBride within Redding's hearing, that he believed that his ankle was broken, Plaintiff does not allege that he had an injury that was apparent to Redding.  In fact, the medical document attached to the complaint, indicates that for four

---

[13]Though Plaintiff asserts that Claim 15 asserts a claim based upon deliberate indifference to a serious medical condition, Claim 15 fails for the same reason that Claim 14 fails.  There are no <u>facts</u> alleged to demonstrate that Defendant knew of the extent of the injury or was deliberately indifferent to it.

days after the incident, he had "been walking on" the ankle.  (Doc. 9, Ex J's)  Likewise, at the medical visit, the doctor determined only that Plaintiff had suffered some "mild to moderate tenderness" and "some associated pain and swelling" from the fracture but "no pain over his hind foot, mid foot or fore foot areas including his metatarsals." Id. This, seemingly minimal pain response, contradicts Plaintiff's implied allegation that Redding was aware of the extent of the injury or was deliberately indifferent to it.

Also, Plaintiff complains that Redding made Plaintiff walk over grass and gravel despite that he was barefoot.  However, there is no indication that Plaintiff suffered any injury as a result, though he claims that doing so was painful.  Plaintiff fails to demonstrate how walking on grass or gravel without any resulting cuts, scrapes or apparent injury of any kind demonstrates that excessive force was used. Likewise, there are no facts alleged that Redding knew that walking on these surfaces would cause harm or that he selected the route used to escort Plaintiff to the program office or, if he did, that he did so for the purpose of causing Plaintiff harm.  Thus, Plaintiff has not stated a cognizable claim against Defendant Redding as to these allegations.

**B.**    *Claims 12, 14, 15[14] - Excessive Force by Defendant McBride*

As to Claims 12 and 14, Plaintiff alleges that McBride forced him to walk despite that he informed McBride that Defendant Redding's baton blows had broken his ankle.  (Doc. 9 at 40) However, for the same reasons described above as to Redding, the fact that McBride determined that Plaintiff would walk to the program office, does not state a cognizable Eighth Amendment claim because there is no showing that McBride knew the extent of the ankle injury or that he was deliberately indifferent to it. Likewise, for the same reasons set forth as to Redding, the fact that Plaintiff walked barefoot over grass and gravel does not state a cognizable Eighth Amendment claim. Thus, as to McBride, the claims are **DISMISSED**.

**C.**    *Claim 14- Excessive Force by Defendant Franco*

Plaintiff claims that Franco assisted in bringing Plaintiff to his feet after hearing him report to McBride that he believed that he had a broken ankle from Redding's baton strike.  (Doc. 9 at

[14]See footnote 13.

40) He alleges also that Franco held one of Plaintiff's handcuffed wrists up in a painful position which forced him to walk while bent over for over 200 yards. Id.  Plaintiff claims that this was done despite that he was offering no resistance. Id.

For the same reasons described above as to Redding, the fact that Franco assisted in making Plaintiff walk to the program office over grass and gravel, does not state a cognizable Eighth Amendment claim because there is no showing that Franco knew the extent of the ankle injury, that walking on these surfaces would cause harm or that Franco was deliberately indifferent to these risks. On the other hand, Plaintiff alleges that lifting his arms up in order to force him into a bent-over position was done despite there being no penological purpose to it given that he was cooperative and offering no resistance. (Doc. 9 at 40)    The Court finds that this is sufficient to allege an Eighth Amendment violation.

### D.      Claim 12, 13, 14- Excessive Force by Hickman and Yates

Once again, however, Plaintiff fails to make any factual allegations that link the actions of Hickman and Yates to the alleged use of excessive force.  To the contrary, Plaintiff takes the position that because they act in supervisory roles, as the Secretary of the CDCR and the warden at the prison, all unconstitutional acts perpetrated by a subordinate will impose liability upon them.  (Doc. 9 at 34.) Stated differently, Plaintiff seeks to impose liability based upon the doctrine of respondeat superior. This is not permitted.   Palmer v. Sanderson, 9 F.3d 1433, 1437-38 (9th Cir. 1993); Monell, 436 U.S. at 691.  Therefore, the claims as to Defendants Hickman and Yates must be **DISMISSED**.

Conclusion

As to Defendant Redding, Plaintiff has stated a cognizable claim under the Eighth Amendment's prohibition against the use of excessive force on Claims 12 and 13.  Plaintiff has not stated an Eighth Amendment  claim against Redding for excessive force on his Claim 14 and this claim is **DISMISSED**.

As to Defendant McBride, Plaintiff has not stated a cognizable claim under the Eighth Amendment on Claims 12, 14 and 15 and these claims are **DISMISSED**.

As to Defendant Franco, Plaintiff has stated a cognizable claim on Claim 14 for excessive force under the Eighth Amendment related to the allegation that Franco forced Plaintiff's arms up to cause him to assume a bent over position despite that Plaintiff was cooperative and submissive at the time.

24

As to Defendants Hickman and Yates, Plaintiff has not stated cognizable claims on Claims 12, 13 or 14 for the use of excessive force and these claims as to these defendants are **DISMISSED**.

vi.      *Claims related to deliberate indifference to medical care - Claims 15, 16, 17, 18*

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97 (1976); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). "In the Ninth Circuit, the test for deliberate indifference consists of two parts." Jett, 439 F.3d at 1096.  First, the plaintiff must show a serious medical need by demonstrating that failure to treat the prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Jett, 439 F.3d at 1096; McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992), overruled in part on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  The existence of an injury that a reasonable doctor would find important and worthy of treatment,  the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment. McGuckin, 974 at 1059-1060 citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir.1990); Hunt v. Dental Dept, 865 F.2d 198, 200-201 (9th Cir.1989).

"Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096. A prison official is "deliberately indifferent" if he actually knows that a prisoner faces a substantial risk of serious harm and disregards that risk. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In other words, the second prong is satisfied by the plaintiff showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096.

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).  It requires "more than ordinary lack of due care for the prisoner's interests or safety." Farmer, 511 U.S. at 835, (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." Id. at 836.  It may be shown by "the way in which prison physicians provide medical care." McGuckin, 974 F.2d at 1062 (9th Cir. 1992).

1    Prison officials may demonstrate "deliberate indifference" when they are aware of the patient's

2    condition but "deny, delay or intentionally interfere with medical treatment." Jett, 439 F.3d at 1096.

3    However, to establish a claim of deliberate indifference based upon delay in medical treatment, the

4    inmate must allege facts to show that the delay was harmful. See Berry v. Bunnell, 39 F.3d 1056, 1057

5    (9th Cir. 1994); Wood v. Housewright, 900 F.2d at1335; Hunt v. Dental Dep't, 865 F.2d at 200; Shapley

6    v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). "A prisoner need not show

7    his harm was substantial; however, such would provide additional support for the inmate's claim that

8    the defendant was deliberately indifferent to his needs." Jett, 439 F.3d at 1096.

9                          ***A.***    *Claim 16- Against McBride and Herrera*

10    Plaintiff complains that when he was taken for medical care, after being struck with the baton

11    by Redding, he was forced to wait for an hour in a holding cell that measured 30" by 30." (Doc. 9 at 44)

12    He asserts that he was forced to stand because he could not lower himself to a sitting position due to the

13    ankle injury. Id. However, Plaintiff provides no facts to explain why this was the case. For example,

14    there are no facts to explain why Plaintiff could not lean against the back or side of the cell, while

15    standing on one foot and with his injured leg outstretched, bend at the knee and lower himself into a

16    sitting position. Likewise, though he asserts that there was no penological reason for forcing him to

17    remain in the small holding cell, this conclusion is belied by the remainder of his complaint. He had

18    repeatedly threatened to kill other inmates and within minutes of being placed in the holding cell, had

19    attacked and beaten two inmates. (Doc. 9 at 8) Plaintiff fails to allege facts to explain why this

20    significant security concern does not justify maintaining him in a holding cell.

21    Conclusion

22    Claim 16 does not state a cognizable Eighth Amendment claim and it is **DISMISSED.**

23                          ***B***.    *Claim 17- Against Hall, McBride, Herrera, Tucker and Lee*

24    Plaintiff alleges that he was not given medical attention for two days after he was struck by

25    Redding. (Doc. 9 at 45) However, Plaintiff admits that within minutes of the event, he was seen by

26    nurse Hall. Id. at 46. Plaintiff alleges that at that time, nurse Hall informed Herrera and McBride that

27    Plaintiff should keep his ankle elevated and have x-rays taken. Id. Although he had a laceration on his

28    leg, Plaintiff claims that it was not bandaged and he was not given supplies to bandage it. Id. Also,

Plaintiff alleges that he was forced to walk on the ankle because no assistive devices were provided and that the x-rays were not taken for two days.  Id.  Plaintiff alleges that because he was forced to walk on the ankle, the swelling became "excessive" and was the size of a "football" (Id. at 46, 47) although the medical report attached to the complaint states only that there was "**some** distal lateral swelling." (Doc. 9, Ex J, emphasis added)

### I.      Claim against Hall

Plaintiff claims that Hall knew of the seriousness of his condition but failed to treat him.  (Doc. 9 at 46-47) However, the facts alleged fail to demonstrate that the cut on Plaintiff's leg was a serious medical condition. Jett, 439 F.3d at 1096; McGuckin, 974 at 1059-1060; Hunt v. Dental Dept, 865 F.2d at 200-201.  Assuming that the ankle was a serious medical condition, Plaintiff has failed to allege any facts to support that Hall was deliberately indifferent to this condition.

He complains that Hall should have provided him a cane or crutches and taken x-rays or referred to other medical staff.  (Doc. 9 at 46-47) However, Hall *did* refer Plaintiff for x-rays and he was examined by Dr. Benyamin early on May 5, 2006 and Dr. Ferro at 10:00 a.m. on that day.  (Doc. 9, Ex J) From the time that Hall saw Plaintiff until the time that Dr. Benyamin saw him, this was a delay, according to Plaintiff of 52 hours.  Id.; Id. at 47.   On the other hand, Plaintiff fails to allege facts to support that Hall had the ability to ensure that his medical appointment occurred more quickly or to provide the medical equipment that Plaintiff desired. Thus, Plaintiff has failed to state a claim under the Eighth Amendment.

### II.      Claim against McBride and Herrera

Plaintiff alleges that McBride and Herrera knew that he may have suffered a broken ankle, that the ankle needed to be elevated and that he needed x-rays.  However, there are no facts alleged that either defendant knew of any delay in treatment or in obtaining the x-rays or that he was not provided crutches or a method by which to elevate his ankle. Likewise, there are no facts to support an inference that either defendant was deliberately indifferent to any serious medical condition that Plaintiff may have had.  Thus, the claim against these defendants must be **DISMISSED**.

### III.      Claim against Lee and Tucker

Plaintiff alleges that on May 3, 2006, Lee saw that Plaintiff's ankle was "swollen up to about the

size of a football" and told Lee that he needed medical care. (Doc. 9 at 47) Although Plaintiff reminded Lee several times about his need for a medical care and asked other inmates to remind him also, no medical care was provided until the morning of May 5, 2006. Id.

Plaintiff alleges that Tucker also saw his swollen foot and told him that he would not be provided medical care in retaliation for his ongoing refusal to accept a cell mate. (Doc. 9 at 47) Plaintiff claims that Tucker said that this treatment was to "make an example" of Plaintiff. Id.

Plaintiff alleges that the delay in obtaining medical care caused him to suffer excessive swelling and greater pain over the following weeks that would have been avoided if medical care had been promptly provided. Upon the facts alleged, Plaintiff has stated a claim for deliberate indifference to his medical condition against Lee and Tucker.

Conclusion

Plaintiff has stated a claim for deliberate indifference to his medical condition against defendants Lee and Tucker. As to all other defendants, Claim 17 is **DISMISSED**.

> C.   *Claims 18, 19, 20, 21- Against Ferro, Benyamin, Dishman, Reeves, Coleman, Roberts*

As noted above, on May 5, 2006, Plaintiff was seen by Doctors Ferro and Benyamin. (Doc. 9 at 49) At that time, the doctors determined that Plaintiff had a "small" fracture and though swelling was noted, the doctors describe it as "some . . . swelling" rather the football-sized description that Plantiff provides. (Doc. 9, Ex J) Dr. Ferro, a orthopedic specialist, oversaw Dr. Benyamin's application of a "fiberglass cast." Id. Dr. Ferro told Plaintiff that he should not bear weight on the ankle and Dr. Ferro discussed with Plaintiff that "If he has any questions or concerns in the interim he knows that he can always get ahold of me on A-yard and I will be happy to see him there." Id. Dr. Ferro told Plaintiff that he would wear the cast for five to six weeks and that Plaintiff was to return to the clinic in five weeks for follow-up care and cast removal. (Doc. 9 at 54) Neither doctor ensured that Plaintiff received crutches or a cane and Plaintiff was not provided crutches until May 11, 2006. (Doc. 9 at 53)

On May 7 and May 8, 2006, Plaintiff complained to nurse Dishman that his cast was too tight and his toes had turned purple and were numb. Id. at 50. On May 9, 2006, Plaintiff was examined by Dr. Benyamin who determined that the cast was too tight and found that Plaintiff's toes were "purplish

1    color." Id.  Plaintiff reported to Dr. Benyamin that he did not keep his foot elevated. (Doc. 9, Ex K)

2    Later that day, Plaintiff was transported to an outside hospital and examined by Dr. Leveque who

3    determined that the wrong type of cast had been placed on Plaintiff.  Id. at 49.  Dr. Leveque placed a

4    plaster splint on Plaintiff that would allow for the swelling.  Id. at 49-50.  Plaintiff claims that Dr.

5    Leveque recommended that Plaintiff follow-up with the ortho clinic at the prison that did not occur. Id.

6    at 55.

7         On June 5, 2006, Plaintiff submitted a request to see the doctor about his cast removal. (Doc. 9

8    at 54; Doc 9, Ex L)  Roberts received the request on "6/8/06" and forwarded it to Dr. Ferro on "6/9/06."

9    Id.  Repeatedly after this date, Plaintiff reminded Dishman that his cast needed to be removed.  (Doc.

10   9 at 55)  Twice, Dishman told Plaintiff that she had informed nurse practitioner, Coleman of this need.

11   Id.  Plaintiff also sent a letter to Coleman reminding her of the need to remove the cast.  The plaster

12   splint was not removed until June 27, 2006.  Id. at 54.

13        Plaintiff claims that having to wear the cast longer caused his recovery to be delayed due to the

14   increased stiffness and swelling caused by the immobilization.  (Doc. 9 at 55) He alleges also that the

15   weight of the cast caused stress on his knee, due to the need for crutches, and caused him to suffer due

16   to the itching caused by the cast.  Id.  Plaintiff claims that wearing the cast too long caused him long term

17   pain to his heel bone.  Id.

18        After his cast was removed, Plaintiff's crutches were taken from him.  Id.  However, he

19   continued to experience pain when walking. (Doc. 9 at 57) On June 28, 2006, Plaintiff requested

20   physical therapy to address the pain he felt in his ankle. Id.  The request was processed by Roberts on

21   July 3, 2006 but Roberts did not schedule him for physical therapy.  Id.  On July 25, 2006, Dr. Benyamin

22   examined Plaintiff and reviewed  the x-ray report.  (Doc. 9, Ex P)  At the time, Plaintiff complained of

23   pain and that "sometimes [he] can't bear wt on that foot."  Id.  The doctor noted that there was "no

24   swelling," that the "ankle was normal in shape and size," there was "no focal nerve deficit" and that

25   Plaintiff had a "normal gait."  Id.  Dr. Benyamin ordered another orthopedic consultation and ordered

26   Plaintiff to receive a cane.  (Id.; Doc. 9, Ex. O)  The prison's medical committee reviewed Dr.

27   Benyamin's "cane chrono" and denied the request for the cane but granted Plaintiff crutches for one

28   month.  (Doc. 9, Ex Q) Plaintiff alleges that this document was "rigged" and that he did not receive

1    either a cane or crutches.  Id.

2    On September 5, 2006, Coleman saw Plaintiff and ordered that he receive a pair of soft shoes

3    due to the difficulty he was having with the normal "flip-flops" provided to Ad Seg inmates.  (Doc. 9

4    at 58; Doc. 9, Ex. R) The request was approved on September 7, 2006.  (Doc. 9 at 58; Doc. 9, Ex. S)

5    Plaintiff did not receive the shoes until a week after he left Ad Seg on September 17, 2006.  Id. at 58.

6    Plaintiff complains that the shoes were insufficient because they were not orthopedic shoes, were poorly

7    constructed and did not fit properly.  Id.  He alleges that these shoes caused him additional pain but wore

8    them nonetheless.  Id.

9    ### I.    Claims against Dishman

10   Plaintiff alleges that Dishman delayed treatment for him for more than 48 hours after she learned

11   that his toes were purple and numb and due to her failure to provide him with material to allow Plaintiff

12   to elevate his foot or to ambulate.  (Doc. 9 at 50-51, 52) These facts are sufficient to state a claim for a

13   violation of the Eighth Amendment.

14   ### II.    Claims against Coleman

15   Plaintiff alleges that Coleman received the form completed by Dr. Levesque that indicated that

16   he was to have a follow-up appointment at the prison's ortho clinic.  (Doc. 9 at 55) Plaintiff asserts that

17   she was required to read these forms and schedule whatever followup was required.  Id.  However, the

18   form that Plaintiff references, attached to the complaint as Exhibit J does not appear to be related to the

19   contact with Dr. Levesque. (Doc. 9, Ex M) Though it does indicate that Plaintiff should "F/U" with

20   "Ortho," it is signed by a doctor whose last name begins with a "C" and first name begins with a "B."

21   Id.  Also, the page is not dated but, even if it is the correct form, there are no facts to demonstrate that

22   Coleman received the form or that she even knew he was to attend a follow up appointment.  On the

23   other hand, the fact that Coleman failed to schedule the follow-up appointment is not sufficient to state

24   a claim unless there are facts that demonstrate that Coleman knew at the time that Plaintiff had a serious

25   medical condition and she was, not merely negligent, but deliberately chose not to schedule a medical

26   appointment for Plaintiff knowing the harm that could result.  Thus, Plaintiff has not stated a claim

27   against Coleman for failing to schedule a follow-up orthopedic examination.

28   In addition, Plaintiff alleges that Coleman was told by Dishman that he had a cast on his leg that

was overdue for removal.  (Doc. 9 at 55) Also, Plaintiff alleges that he sent Coleman a letter reminding her that his cast needed to be removed.  Id.  However, Plaintiff fails to allege when Coleman was told this by Dishman and when he sent the letter.  Without this information, the Court cannot determine whether there was any delay caused by Coleman.  Also, there are no facts alleged that Coleman acted with deliberate indifference to his medical condition.  At most, Plaintiff has alleged simple medical negligence.  This is insufficient.

Finally, Plaintiff alleges that Coleman ordered that he receive "soft shoes."  (Doc. 9 at 57-58) The order was approved but he did not receive them for approximately three weeks.  Id.  There are no facts alleged that Coleman knew that Plaintiff had not received the shoes or, for that matter, that she played any role in the delay in their receipt.  Thus, Plaintiff has not stated an Eighth Amendment claim against Coleman.

### III.     Claims against Drs. Benyamin and Ferro

As to Drs. Benyamin and Ferro, the facts alleged, at most, demonstrate that the treatment provided was negligent.  The evidence attached to the complaint indicates that the extra swelling was caused, at least in part, by Plaintiff's failure to keep his foot elevated. (Doc. 9, Ex. K) This implies that it was the unanticipated swelling which caused the cast to be deemed inappropriate. There are no facts alleged that would support an inference that either doctor provided the treatment they did for the purpose of causing Plaintiff harm.  In fact, Dr. Ferro invited Plaintiff to contact him on the A-yard if he had any questions or concerns.  (Doc. 9, Ex J) This is a far cry from a doctor who provides treatment with deliberate indifference to the resulting harm.  Likewise, rather than forcing Plaintiff to remain in the too-tight cast, Dr. Benyamin had him transported to an outside facility for an orthopedic review and ordered that he receive a new cast. (Doc. 9 at 49-50) Later, he ordered Plaintiff to receive a cane.  (Doc. 9, Ex Q) These facts do not demonstrate indifference to Plaintiff's condition but an appropriate level of professional concern.

Plaintiff complains that Benyamin and Ferro violated the constitution by failing to ensure that he received materials to allow him to keep his leg elevated and by failing to provide him ambulatory devices.  (Doc. 9 at 50, 52, 57) However, the attachments to the complaint make clear that neither doctor had the authority to provide these items.  (Doc. 9, Exs. Q, S) Instead, whether an inmate receives these

31

items is determined by the prison's medical committee and then the items are provided by others at the prison. <u>Id.</u> To suggest that the constitution places liability on a doctor under these circumstances is unsupported.

Finally, Plaintiff alleges that Ferro failed to ensure that his cast was removed in a timely fashion. Plaintiff notes that when Ferro oversaw the application of the cast on May 5, 2006, he said that the cast would remain on for five to six weeks. (Doc. 9 at 54-55; Doc. 9, Ex J)  After this, on May 9, 2006, this cast was removed and a plaster-splint was applied.  (Doc. 9 at 54) There are no facts alleged that anyone ever told Plaintiff that the plaster splint would stay on for the same amount of time as the original cast or that the time spent in the regular cast would "count" toward the amount of time in the plaster-splint. Moreover, there are no facts alleged that Dr. Ferro was responsible for making appointments for follow-up contact and, in fact, Plaintiff alleges that this was the job of others on the medical staff.  (Doc. 9 at 55) Moreover, the pleading demonstrates that Dr. Ferro did not continue as Plaintiff's treating physician on the case.  Instead, after the cast was placed on Plaintiff on May 5, 2006, Dr. Ferro had no further contact with Plaintiff and the care was continued by Dr. Benyamin.

Because medical malpractice does not violate the Eighth Amendment (<u>McGuckin</u>, 974 F.2d at 1059(medical negligence does not violate the Eighth Amendment); <u>Toguchi,</u> 391 F.3d at 1057), the claims as to Drs. Benyamin and Ferro must be **DISMISSED**.

### IV.    Claims against Roberts

Plaintiff alleges that on June 5, 2006, he submitted a request to have his cast removed and that it was received and processed by nurse Roberts.  (Doc. 9 at 54-55) Roberts processed the request in a timely fashion.  (Doc. 9, Ex L) However, Plaintiff did not receive medical treatment attention until June 27, 2006. <u>Id.</u> at 54.  Plaintiff offers no other facts to suggest that Roberts knew of the delay in Plaintiff receiving the medical treatment or that she had any control over the timeliness of the provision of medical treatment.  There are no facts alleged that suggest that Roberts was deliberately indifferent to Plaintiff's medical condition.

Likewise, Plaintiff alleges that he requested physical therapy and that this request was processed by Roberts but she did not schedule him for therapy.  (Doc. 9 at 57) Plaintiff fails to allege any facts to support that Roberts, a mere nurse, had the authority to order physical therapy for him.  In light of the

1   fact that even doctors could only *recommend* medical assistive devices like canes, crutches and shoes

2   (Doc. 9, Ex. Q, S) and it was a prison committee who actually decides whether the inmate gets these

3   items, it is inconceivable and lacking in any factual support, that a nurse could make a decision to order

4   physical therapy for an inmate.  Thus, Plaintiff has failed to state a claim for a constitutional deprivation

5   against Roberts.

6                                    *V.    Claims against Reeves*

7           Finally, Plaintiff has failed to state facts to support a claim against Reeves, who was a custodial

8   staff member.  Though Plaintiff alleges that Reeves was aware that Plaintiff's foot was swollen and that

9   he had no materials with which to elevate his foot, there are no facts alleged that Reeves had any medical

10  training or any reason to know that the foot needed to be elevated or that the failure to elevate the foot

11  caused the swelling.  (Doc. 9 at 51) Likewise, Plaintiff alleges that Reeves knew that his foot was

12  swollen but failed to provide him crutches. Id. at 53.

13          However, Reeves was dealing with Plaintiff who, admittedly, was assaultive and violent as

14  recently as one week before when he attacked and beat the two inmates.  The suggestion that Reeves

15  should have disregarded the institution's security policy and provide this equipment, without having any

16  other information or instruction from medical staff, is unsupported.  Thus, the claim against Reeves must

17  be **DISMISSED**.

18  Conclusion

19          As to Claim 18, Plaintiff has stated a cognizable claim for deliberate indifference to an alleged

20  serious medical condition against defendant Dishman, based upon her delay in providing medical

21  treatment for Plaintiff's swollen foot.  As to all other defendants to Claim 18, Plaintiff has failed to state

22  a cognizable claim and Claim 18 is **DISMISSED**.  Also, as to Claims 19, 20 and 21, Plaintiff has failed

23  to state a cognizable claims under the Eighth Amendment and these claims are **DISMISSED**.

24          **F.    Leave to Amend**

25          In sum, the Court finds that Plaintiff's allegations appear to state cognizable Eighth Amendment

26  claims against Defendants Trimble, Williams, Brown, Reeves, Redding, Franco, Lee, Tucker and

27  Dishman.  Plaintiff's allegations as to any other defendant, however, fail to state cognizable claims.

28          Plaintiff may therefore proceed in one of two ways.  First, Plaintiff may elect to serve the

complaint on Defendants Trimble, Williams, Brown, Reeves, Redding, Franco, Lee, Tucker and Dishman on the claims described above.  Second, Plaintiff may delay service and file an amended complaint, attempting to cure the deficiencies identified by the Court in this order.  See Noll v. Carlson, 809 F.2d 1446, 1448-49 (9th Cir. 1987) ("A pro se litigant must be given leave to amend his or her complaint unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment.") (internal quotations omitted).

If Plaintiff elects to file an amended complaint, he is cautioned that he may not change the nature of this suit by adding new and unrelated claims.  See George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) (no "buckshot" complaints).  Plaintiff is advised also that once he files an amended complaint, his original pleadings are superceded and no longer serve any function in the case.  See Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967).  Thus, the amended complaint must be "complete in itself without reference to the prior or superceded pleading."  Local Rule 220.  "All causes of action alleged in an original complaint which are not [re-]alleged in an amended complaint are waived."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987) (citations omitted).

## IV.   **CONCLUSION**

In accordance with the above, it is HEREBY ORDERED that:

1.   Plaintiff's motion under Rule 60 is **DENIED**.

2.   As to Claims 2 through 7, Claim 11 and all acts alleged in Claims 8 through 10 that are alleged to have occurred before March 8, 2006, these Claims are **DISMISSED**;

3.   As to Claim 1, Plaintiff has stated an Eighth Amendment violation against Defendants Trimble, Williams, Brown and Reeves related to the temperature of the cell only. As to all other defendants or claims, Claim 1 is **DISMISSED**.

4.   As to Claim 8, the claim is **DISMISSED.**

5.   As to Claim 9, the claim is **DISMISSED.**

6.   As to Claim 10, the claim is **DISMISSED.**

7.   As to Claims 12 and 13, Plaintiff has stated a cognizable claim under the Eighth Amendment's prohibition against the use of excessive force against Defendant Redding.

8.   As to Claim 14, Plaintiff has stated a cognizable claim under the Eighth Amendment for

excessive force against Defendants Redding and Franco related <u>only</u> to the allegation that they forced Plaintiff's arms up and forced him into a painful position despite that Plaintiff was cooperative and submissive at the time.  As to all other defendants or claims, Claim 14 is **DISMISSED**.

9.    As to Claims 12, 14 and 15 against Defendant McBride, these claims are **DISMISSED**.

10.   As to Claims 12, 13 or 14 against Defendants Hickman and Yates, these claims are **DISMISSED**.

11.   As to Claim 16, the claim is **DISMISSED.**

12.   As to Claim 17, Plaintiff has stated a claim for deliberate indifference to his medical condition against defendants Lee and Tucker only.  As to all other claims and defendants, Claim 17 is **DISMISSED**.

13.   As to Claim 18, Plaintiff has stated a cognizable claim for deliberate indifference to an alleged serious medical condition against defendant Dishman only.  As to all other claims and defendants, Claim 18 is **DISMISSED**.

14.   As to Claims 19, 20 and 21, these claims are **DISMISSED**.

15.   Within thirty (30) days from the date of service of this order, Plaintiff shall either:

a.    Notify the Court in writing that he wishes to serve the complaint on Defendants Trimble, Williams, Brown, Reeves, Redding, Franco, Lee, Tucker and Dishman as outlined above; or

b.    File an amended complaint attempting to cure the deficiencies identified by the Court in this order.

16.   The Clerk of the Court is directed to send Plaintiff the form complaint for use in a civil rights action; and

17.   Plaintiff is cautioned that failure to comply with this order will result in the dismissal of this case.  <u>See</u> Fed. R. Civ. P. 41(b).

IT IS SO ORDERED.

Dated:  __January 14, 2011__                             _____/s/ Jennifer L. Thurston_____
                                                                          UNITED STATES MAGISTRATE JUDGE